# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

_____

|  |  |  |
|---|---|---|
| JEANNE BURLSWORTH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:10-CV-258 (SWW) |
| | ) | |
| ERIC HOLDER, in his official capacity | ) | |
| as Attorney General of the United States, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____


## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS


TONY WEST
Assistant Attorney General

JANE DUKE
United States Attorney

SHEILA M. LIEBER
Deputy Director, Federal Programs
Branch, Civil Division

JUSTIN M. SANDBERG
Trial Attorney
U.S. Dept. of Justice, Civil Division,
Federal Programs Branch
20 Mass. Ave., NW, Rm. 7302
Washington, DC 20001
(202) 514-5838 phone
(202) 616-8202 fax
justin.sandberg@usdoj.gov

Attorneys for Defendants

## Table of Contents

INTRODUCTION ........................................................................................................1

STATUTORY BACKGROUND ................................................................................4

ARGUMENT .............................................................................................................7

I.     The Court Lacks Jurisdiction Over Plaintiffs' Claims .......................................7

     A.     Plaintiffs' Cannot Establish Standing to Sue ...........................................7

     B.     Plaintiffs' Challenges to the Minimum Coverage Provision Are Unripe .............10

     C.     The Anti-Injunction Act Bars Plaintiffs' Challenges
            to the Minimum Coverage (Provision?) ...............................................11

II.    The Comprehensive Regulatory Measures of the ACA Fall within Congress's
     Article I Powers .............................................................................................12

     A.     Congress's Authority to Regulate Interstate Commerce is Broad ........................12

     B.     The ACA Regulates the Interstate Markets in Health Insurance and
            Health Care Services..........................................................................15

     C.     The Minimum Coverage Provision Is an Integral Part of the Larger
            Regulatory Scheme and Is Necessary and Proper to Congress's Regulation
            of Interstate Commerce.......................................................................16

     D.     The Minimum Coverage Provision Regulates Activity that Substantially
            Affects Interstate Commerce .............................................................20

     E.     The Minimum Coverage Provision Is a Valid Exercise of Congress's
            Independent Power under the General Welfare Clause .........................................24

III.   The Minimum Coverage Is Not a Direct Tax that Would Require Apportionment
     among the States .............................................................................................27

     A.     As a Valid Exercise of Congress's Commerce Clause Powers,
            the Minimum Coverage Provision Is Not Subject to Apportionment....................27

     B.     The Minimum Coverage Provision Is Not a "Direct Tax" ....................................29

IV.   Plaintiffs' Tenth Amendment Claim Should Be Dismissed ...............................31

V.    The Guarantee Clause Claim Fails .................................................................32

i

CONCLUSION......................................................................................................................34

## <u>INTRODUCTION</u>

Repeatedly, the Supreme Court has underscored its "concern about the proper – and properly limited – role of the courts in a democratic society." <u>Summers v. Earth Island Inst.</u>, 129 S. Ct. 1142, 1148 (2009) (internal quotation and citation omitted). Plaintiffs ask this Court to step beyond that limited role, to take the extraordinary step of striking down the minimum coverage provision of the Patient Protection and Affordable Care Act ("ACA" or "the Act") and, indeed, to enjoin implementation of that provision now, even though it does not take effect until 2014. <u>See</u> Pub. L. No. 111-148, 124 Stat. 119 (Mar. 23, 2010), <u>as amended by</u> Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (Mar. 30, 2010). The minimum coverage provision will require individuals, with exceptions, to maintain a minimum level of health care insurance coverage or pay a penalty. Plaintiffs, two individuals, sue on behalf of themselves and a putative class of "persons in Arkansas who fall within the purview of the Act [,] will be required to purchase health insurance [,] and who refuse to enter into a contract for the purchase of health insurance." Class Action Petition For Injunctive and Declaratory Relief, April 27, 2010 ("Complaint"), ¶¶ 45(A), (B). They claim that the Act exceeds Congress's powers under Article I of the Constitution, violates the Tenth Amendment, and deprives Arkansas of a republican form of government in contravention of the Constitution's Guarantee Clause, U.S. Const., art. IV, § 4. Compl. ¶¶ 29-41.

The Court should dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). It is a bedrock principle of judicial restraint that federal courts will address only an actual case or controversy. And there can be no case or controversy without plaintiffs who have suffered actual or imminent injury traceable to defendants' conduct and who, therefore, have standing to sue. Plaintiffs here do not have standing. Their predictions of injury three and a half

years from now are merely speculative, depending as they do on guesses about their own circumstances and the effects of the Act. (The claims are not ripe for similar reasons.)  Nor can plaintiffs create standing by choosing to reallocate their resources based on those guesses.  If they could, any plaintiff could claim injury from the most remote contingencies because he took action now in anticipation of possibility of future impact.  Such an approach would eviscerate the doctrine of standing by allowing plaintiffs to circumvent the fundamental prerequisites of Article III standing, injury-in-fact and traceability.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

Plaintiffs' claims also fail on the merits.  In challenging Congress's Power under Article I, Plaintiffs invoke long-discredited Lochner-era understandings of congressional power.  In adopting these provisions, Congress acted well within its authority under the Commerce Clause as understood by courts for the last 70 years.  Congress determined that, without the minimum coverage provision, the key reforms in the Act – such as the ban on denying coverage and setting premiums based on pre-existing conditions – would not work, as they would amplify existing incentives for individuals to "wait to purchase health insurance until they needed care," shifting even greater costs onto third parties. Pub. L. No. 111-148 §§ 1501(a)(2)(I), 10106(a).  Congress thus found that the minimum coverage provision "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." Id.  Congress also understood, and plaintiffs do not deny, that virtually everyone at some point needs medical services, which cost money.  The ACA regulates economic decisions about how to pay for those services – whether to pay in advance through insurance or to attempt to do so later out of pocket (often unsuccessfully) – decisions that, "in the aggregate," substantially affect the vast, interstate health

2

care market.  Gonzales v. Raich, 545 U.S. 1, 22 (2005).  Congress has authority under the Commerce Clause and the Necessary and Proper Clause to address these substantial effects by adopting the minimum coverage provision.

In addition, Congress has independent authority to enact these provisions as an exercise of its power under Article I, Section 8, to lay taxes and make expenditures to promote the general welfare.  License Tax Cases, 72 U.S. (5 Wall.) 462, 471 (1867).  The minimum coverage provision will raise substantial revenues, and it is therefore valid under longstanding precedent, even though Congress also had a regulatory purpose in enacting the provision.  It is equally well-established that a tax predicated on a volitional event – such as a decision not to purchase health insurance – is not a "direct tax" subject to apportionment under Article I, Sections 2 and 9. United States v. Mfrs. Nat'l Bank of Detroit, 363 U.S. 194, 197-98 (1960); Tyler v. United States, 281 U.S. 497, 502 (1930).

Plaintiffs' other claims fare no better.  Plaintiffs' Tenth Amendment Claim is either an assertion that the ACA invades Arkansas's sovereign interests or a restatement of their claim that Congress lacks the power under Article I to enact the ACA.  Neither version withstands scrutiny: Private citizens do not have standing to assert a state's sovereign interest, and repackaging their Article I claim does not fix the fatal flaws in the original version.   The Guarantee Clause claim is similarly baseless.  Even if Guarantee Clause claims were justiciable – which they are not – and even if private citizens could raise the claims – which they cannot – the claim would fail because the ACA does not meddle in any way, large or small, with the form of Arkansas's government.

## STATUTORY BACKGROUND

In 2009, the United States spent more than 17% of its gross domestic product on health care, in a $2.5 trillion market.  Pub. L. No. 111-148, §§ 1501(a)(2)(B), 10106(a).  Notwithstanding this extraordinary expenditure, 45 million people – an estimated 15% of the population – went without health insurance for some portion of 2009, and, absent the new legislation, that number would have climbed to 54 million by 2019. Cong. Budget Office ("CBO"), 2008 Key Issues in Analyzing Major Health Insurance Proposals 11 (Dec. 2008) (hereinafter Key Issues); see also CBO, The Long-Term Budget Outlook 21-22 (June 2009).

The record before Congress documented the staggering costs that a broken health care system visits on individual Americans and the nation as a whole.  The millions who lack health insurance coverage still receive medical care, but often cannot pay for it.  The costs of that uncompensated care, $43 billion in 2008 alone, are shifted to providers, the insured population (in the form of higher premiums), governments, and taxpayers.  Pub. L. No. 111-148, §§ 1501(a)(2)(F), 10106(a).  But cost shifting is not the only harm imposed by the lack of insurance.  Congress found that the "economy loses up to $207,000,000,000 a year because of the poorer health and shorter lifespan of the uninsured," Pub. L. No. 111-148, §§ 1501(a)(2)(E), 10106(a), and concluded that 62 percent of all personal bankruptcies result in part from medical expenses, id. §§ 1501(a)(2)(G), 10106(a).  All these costs, Congress determined, substantially affect interstate commerce.  Id. §§ 1501(a)(2)(F), 10106(a).

In order to remedy this enormous problem for the American economy, the Act comprehensively "regulates activity that is commercial and economic in nature: economic and financial decisions about how and when health care is paid for, and when health insurance is purchased."  Id. §§ 1501(a)(2)(A), 10106(a).  First, to address inflated fees and premiums in the

individual and small-business insurance market, Congress established health insurance

exchanges "as an organized and transparent marketplace for the purchase of health insurance

where individuals and employees (phased-in over time) can shop and compare health insurance

options." H.R. Rep. No. 111-443, pt. II, at 976 (2010) (internal quotation omitted). The

exchanges will regulate premiums, implement procedures to certify qualified health plans,

coordinate participation and enrollment in health plans, and provide consumers with needed

information. Pub. L. No. 111-148, § 1311.

Second, the Act builds on the existing system of health insurance, in which most

individuals receive coverage as part of their compensation. See CBO, Key Issues, at 4-5. It

creates a system of tax incentives for small businesses to encourage the purchase of health

insurance for their employees, and through the employer responsibility provision, imposes

penalties on certain large businesses that do not provide their employees adequate coverage.

Pub. L. No. 111-148, §§ 1421, 1513. The employer responsibility provision will (i) create

incentives for large employers to provide a minimum level of coverage, alleviating the "job

lock" that occurs when workers decline to take better jobs because they must give up their

current health plan and may be unable to obtain a comparable one, see CBO, Key Issues at 8, and

(ii) prevent "employers who do not offer health insurance to their workers" from gaining "an

unfair economic advantage" over those who do offer it. H.R. Rep. No. 111-443, pt. II, at 984-85.

Third, the Act will subsidize insurance coverage for much of the uninsured population.

As Congress understood, nearly two-thirds of the uninsured are in families earning below 200

percent of the federal poverty level, H.R. Rep. No. 111-443, pt. II, at 978 (2010); see also CBO,

Key Issues, at 27, while 4 percent of those with income greater than 400 percent of the poverty

level are uninsured. CBO, Key Issues, at 11. The Act will plug this gap by providing health

insurance tax credits and reduced cost-sharing for those with income between 133 and 400 percent of the federal poverty line, Pub. L. No. 111-148, §§ 1401-02, and expanding eligibility for Medicaid to those below 133 percent of the federal poverty level beginning in 2014.  Id. § 2001.

Fourth, the Act will remove barriers to insurance coverage.  It will prohibit widespread insurance industry practices that increase premiums – or deny coverage entirely – to those with the greatest need for health care.  For example, the Act will bar insurers from refusing to cover individuals with pre-existing medical conditions and prohibit insurers from setting lifetime limits on the dollar value of coverage.  Pub. L. No. 111-148, §§ 1001, 1201, 10101(a).[1]

Finally, the Act will require that all Americans, with specified exceptions, maintain a minimum level of health insurance coverage, or pay a penalty on their tax returns starting with tax year 2014.  Id. §§ 1501, 10106, as amended by Pub. L. No. 111-152, § 1002.  Congress found that this provision "is an essential part of this larger regulation of economic activity," and that its absence "would undercut Federal regulation of the health insurance market."  Id. §§1501(a)(2)(H), 10106(a).  That judgment rested on detailed Congressional findings.  Congress found that, by "significantly reducing the number of the uninsured, the minimum coverage requirement, together with the other provisions of this Act, will lower health insurance premiums."  Id. §§ 1501(a)(2)(F), 10106(a).  Conversely, Congress also found that, without the minimum coverage provision, the reforms in the Act, such as the ban on denying coverage based on pre-existing conditions, would amplify existing incentives for individuals to "wait to purchase health insurance until they needed care," thereby further shifting costs onto third parties.  Id. §§ 1501(a)(2)(I), 10106(a).  Congress thus found that the minimum coverage provision "is

---

[1]     It will also prevent insurers from rescinding coverage for any reason other than fraud or misrepresentation, or declining to renew coverage based on health status.  Id. §§ 1001, 1201.

essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold."   Id.

The CBO projects that by 2019, the reforms in the Act will reduce the number of uninsured Americans by 32 million.  Letter from Douglas W. Elmendorf, Director, CBO, to the Hon. Nancy Pelosi, Speaker, U.S. House of Representatives 9 (Mar. 20, 2010) (hereinafter CBO Letter).  It further projects that the Act's combination of reforms, subsidies, and tax credits will reduce the average premium paid by individuals and families in the individual and small-group markets.  Id. at 15; CBO, An Analysis of Health Insurance Premiums Under the Patient Protection and Affordable Care Act 23-25 (Nov. 30, 2009).  And the CBO estimates that the interrelated revenue and spending provisions in the Act – specifically including revenue from the employer responsibility and minimum coverage provisions – will yield net savings to the federal government of more than $100 billion over ten years.  CBO Letter at 2.

## ARGUMENT

### I.   The Court Lacks Jurisdiction Over Plaintiffs' Claims.

Plaintiffs bear the burden to show subject matter jurisdiction under Rule 12(b)(1), and the Court must determine whether it has subject matter jurisdiction before addressing the merits of the complaint.  See Steel Co. v Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  Plaintiffs cannot satisfy their burden.

### A.  Plaintiffs Cannot Establish Standing to Sue.

To have standing to sue, a "plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"—that is fairly traceable to the challenged conduct.  Lujan, 504

U.S. at 560 (internal citations, quotation marks, and footnote omitted).  Allegations of "an injury at some indefinite future time" do not show an injury in fact, particularly where "the acts necessary to make the injury happen are at least partly within the plaintiff's own control."  Id. at 564 n.2.  In these situations, "the injury [must] proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all."  Id.

Plaintiffs' allegations fail this test.  The minimum coverage provision will not take effect until 2014.  Even then, if an individual is subject to the provision and elects not to comply, any penalty would not be payable until his tax return for that year is due (i.e., April 2015).  This supposed injury is "too remote temporally" to support standing.  McConnell v. FEC, 540 U.S. 93, 225 (2003) (no standing where law regulating the cost of campaign ads would not affect Senator for more than four years, when he planned to run for reelection), overruled in part on other grounds by Citizens United v. FEC, 130 S. Ct. 876 (2010).  Much can change over three and a half years, making any attempt to predict harm to a particular member highly uncertain.  An individual may become eligible for Medicare or Medicaid, and thus satisfy the minimum coverage provision.  Her income could fall, making the provision inapplicable.  She may take a job offering qualifying coverage.  Or, discovering a pre-existing condition or suffering an illness, she could decide that buying coverage is a sensible choice.  Thus, as of now, any harm that an individual member might suffer is remote rather than imminent, speculative rather than concrete, and "at least partly within [his] own control."  Lujan, 504 U.S. at 564 n.2.

Plaintiffs cannot circumvent their lack of an impending injury by asserting that preparation for the minimum coverage provision is currently forcing them to forego purchases they otherwise would have made, and make purchases they otherwise would not have made.[2]

---

[2]       Plaintiffs, suggest, but do not allege that they currently lack health insurance coverage.

Compl. ¶ 27.  Such a reallocation of resources cannot itself qualify as an imminent "injury" because it "stems not from the operation of [the challenged statute] but from [plaintiffs'] own . . . personal choice," McConnell, 540 U.S. at 228.  See Utah Shared Access Alliance v. Carpenter, 463 F.3d 1125, 1137-38 (10th Cir. 2006), cert. denied, 550 U.S. 904 (2007); Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales, 468 F.3d 826, 831 (D.C. Cir. 2006); Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1276 (D.C. Cir. 1994). Moreover, for the same reason, any decision that plaintiffs make to reallocate resources in anticipation of future budgetary needs is not "fairly traceable" to the ACA.  Summers, 129 S. Ct. at 1149.  Indeed, if plaintiffs' anticipatory resource allocation could satisfy the "causation" and injury elements of standing, it would gut standing doctrine.  A plaintiff facing a 10 percent, or even 1 percent, risk of some future event could start saving now in anticipation of the potential expenses, and thus assert standing to sue over the most remote and uncertain contingencies.  The prospect that plaintiffs will suffer financial harm from the minimum coverage provision is such a remote and uncertain contingency.[3]  See United States v. Metro. St. Louis Sewer Dist., 569 F.3d 829, 835-837 (8th Cir. 2009) (concluding that association did not have standing to intervene in a lawsuit because the injury alleged – an increase in sewer rates – depended on a number of contingencies and thus constituted mere speculation).   Plaintiffs thus satisfy neither the injury-in-fact nor the causation requirement under Article III, and the Court lacks jurisdiction over their claim.[4]

---

[3]      Plaintiffs' health care expenses in 2014 may be lower than what they currently spend on health care – either by way of insurance or out of pocket costs – for any number of reasons.  For example, plaintiffs might obtain different employment that includes insurance as a benefit, or due to unforeseen financial or medical circumstances, plaintiffs might qualify for Medicare or Medicaid.

[4]      The recent decision in Virginia ex rel. Cuccinelli v. Sebelius, 2010 WL 2991385 (E.D. Va. Aug. 2, 2010), provides no support for plaintiffs' allegations of standing.  The Court rested its conclusion that the Commonwealth had standing on a rationale unique to a state plaintiff.  Id.

**B.  Plaintiffs' Challenges to the Minimum Coverage Provision Are Unripe.**

For similar reasons, plaintiffs' challenges to the minimum coverage provision are not ripe for review.  The ripeness inquiry "evaluate[s] both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967).  Plaintiffs satisfy neither prong of the inquiry.  No injury could occur before 2014, and plaintiffs have not shown one will occur even then.  See Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-81 (1985) (claim not ripe if it rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all" (citation and internal quotation marks omitted)); Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 17-18 (D.D.C. 2001) ("[W]ith respect to the 'hardship to the parties' prong, an abstract harm is not sufficient; there must be an immediate harm with a 'direct effect on the day-to-day business of the plaintiffs.'") (quoting Texas v. United States, 523 U.S. 296, 301 (1998)).  Moreover, that a party may incur "preparation costs" before a rule takes effect does not establish a sufficient hardship to warrant review of a claim predicated upon future contingencies.  See CTIA – Wireless Ass'n v. FCC, 530 F.3d 984, 988-89 (D.C. Cir. 2008).

To be sure, where the operation of a statute against certain individuals is inevitable, "it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect."  Blanchette v. Conn. Gen. Ins. Corp., 419 U.S. 102, 143 (1974).  However, as explained above, in contrast to Blanchette, any injury to plaintiffs here is far from "inevitabl[e]."  Nor is this a case like Abbott Labs., where the plaintiffs demonstrated an "immediate" and "direct effect on [their] day-to-day business."  387 U.S. at 152.  This case instead involves "contingent future events that may not occur as anticipated, or indeed may not occur at all."  Thomas, 473 U.S. at 580-81.  Even where only "a purely legal question" is

at *5-*7.

presented, uncertainty as to whether a statute will harm the plaintiffs renders the controversy unripe. Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 163-64 (1967). If this Court were to rule, developments between now and 2014 could render its opinion purely advisory. That is precisely what the ripeness doctrine seeks to avoid.

### C.  The Anti-Injunction Act Bars Plaintiffs' Challenges to the Minimum Coverage Provision.

The Court also lacks jurisdiction over plaintiffs' challenge to the minimum coverage provision because it seeks to restrain the federal government from collecting the penalty specified under that provision. The Anti-Injunction Act ("AIA") provides in relevant part that, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." I.R.C. § 7421(a). It does not matter whether the payment sought to be enjoined is labeled a "penalty" rather than a "tax." Cf. I.R.C. § 5000A(b) (imposing a "penalty"). With exceptions immaterial here, this penalty is "assessed and collected in the same manner" as other penalties under the Internal Revenue Code, I.R.C. § 5000A(g)(1), and, like these other penalties, falls within the bar of the AIA. I.R.C. § 6671(a); see Nuttelman v. Vosberg, 753 F.2d 712, 714 (8th Cir. 1985) (holding that "penalties and interest are treated as taxes"); Barr v. United States, 736 F.2d 1134, 1135 (7th Cir. 1984) ("Section 6671 provides that the penalty at issue here is a tax for purposes of the Anti-Injunction Act."). Applying the AIA here serves its purpose, to preserve the government's ability to collect such assessments expeditiously with "a minimum of preenforcement judicial interference and to require that the legal right to the disputed sums be determined in a suit for refund." Bob Jones Univ. v. Simon, 416 U.S. 725, 736 (1974) (internal quotation omitted).[5]

---

[5]      The Declaratory Judgment Act, 28 U.S.C. § 2201(a), similarly bars declaratory relief

District courts accordingly lack jurisdiction to order the abatement of any liability for a

tax or a penalty, apart from their power to consider validly-filed claims for refunds.  Bartley v.

United States, 123 F.3d 466, 467-68 (7th Cir. 1997).  These jurisdictional limitations apply even

where, as here, plaintiffs raise a constitutional challenge to a statute that imposes a penalty.

United States v. Clintwood Elkhorn Mining Co., 553 U.S. 1, 10 (2008).  The AIA therefore bars

plaintiffs' effort to enjoin collection of the minimum coverage penalty.

## II.   The Comprehensive Regulatory Measures of the ACA Fall within Congress's Article I Powers.

Even if this Court had subject matter jurisdiction and could reach the merits of plaintiffs'

constitutional challenges to the minimum coverage provision of the Act, they would still fail.

Under Federal Rule of Civil Procedure 12(b)(6), "[t]o survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible

on its face."  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (internal quotation marks omitted).

Plaintiffs do not state a claim upon which relief may be granted.[6]

### A.   Congress's Authority to Regulate Interstate Commerce is Broad.

The Constitution grants Congress power to "regulate Commerce . . . among the several

States," U.S. Const., art. I, § 8, cl. 3, and to "make all Laws which shall be necessary and proper"

to the execution of that power, id. cl. 18.  This grant of authority is expansive.  Congress may

---

here, providing jurisdiction to the district courts to grant such relief  "except with respect to
Federal taxes."  As the Supreme Court noted in Bob Jones University, 416 U.S. at 732 n.7, the
tax exception to the Declaratory Judgment Act demonstrates the "congressional antipathy for
premature interference with the assessment or collection of any federal tax."

[6]     In presenting a facial challenge to a federal statute, as the plaintiffs do here, a plaintiff
may prevail only "by 'establish[ing] that no set of circumstances exists under which the Act
would be valid,' i.e., that the law is unconstitutional in all of its applications."  Wash. State
Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008) (quoting United States v.
Salerno, 481 U.S. 739, 745 (1987)); see also Nebraska v. EPA, 331 F.3d 995, 998 (D.C. Cir.
2003) (rejecting facial Commerce Clause challenge to federal statute); United States v. Sage, 92
F.3d 101, 106 (2d Cir. 1996) (same).  Plaintiffs cannot make this showing.

"regulate the channels of interstate commerce"; it may "regulate and protect the instrumentalities

of interstate commerce, and persons or things in interstate commerce"; and it may "regulate

activities that substantially affect interstate commerce." Raich, 545 U.S. at 16-17.  The question

is not whether any one person's conduct affects interstate commerce, but whether Congress

rationally concluded that the <u>class of activities</u>, "taken in the aggregate," substantially affects

interstate commerce.  Id. at 22; see also Wickard v. Filburn, 317 U.S. 111, 127-28 (1942).  In

other words, "[w]here the class of activities is regulated and that class is within the reach of

federal power, the courts have no power to excise, as trivial, individual instances of the class."

Raich, 545 U.S. at 23 (citation and quotation omitted).

        In exercising its Commerce Clause power, Congress may reach even wholly intrastate,

non-commercial matters when it concludes that doing so is necessary to a larger program

regulating interstate commerce.  Raich, 545 U.S. at 18; see also Monson v. DEA, 589 F.3d 952,

962-65 (8th Cir. 2009).  Thus, when "a general regulatory statute bears a substantial relation to

commerce, the de minimis character of individual instances arising under that statute is of no

consequence." Raich, 545 U.S. at 17 (internal quotation omitted).  See also id. at 37 (Scalia, J.,

concurring in the judgment) (noting that Congress's authority to make its regulation of

commerce effective is "distinct" from its authority to regulate matters that substantially affect

interstate commerce); United States v. Stewart, 451 F.3d 1071, 1076-77 (9th Cir. 2006).

        In assessing congressional judgments on these issues, the Court's task "is a modest one."

Raich, 545 U.S. at 22.  The Court need not itself measure the impact on interstate commerce of

the subject of Congress's regulation, nor need the Court itself calculate how integral a particular

provision is to a larger regulatory program.  The Court's task instead is simply to determine

"whether a 'rational basis' exists for [Congress's] conclusions." Id. (quoting United States v.

13

*Lopez*, 514 U.S. 549, 557 (1995)).  Under rational basis review, this Court may not second-guess the factual record upon which Congress relied.

*Raich* and *Wickard v. Filburn*, 317 U.S. 111 (1942), illustrate the breadth of the Commerce power and the deference accorded Congress's judgments.  In *Raich*, the Court sustained Congress's authority to prohibit possession of home-grown marijuana intended solely for personal use; it was sufficient that the Controlled Substances Act "regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market."  *Raich*, 545 U.S. at 26.  Similarly, in *Wickard*, the Court upheld a penalty on wheat grown for home consumption despite the farmer's protests that he did not intend to sell the commodity.  It was sufficient that the existence of homegrown wheat, in the aggregate, could "suppl[y] a need of the man who grew it which would otherwise be reflected by purchases in the open market," thus undermining the efficacy of the federal price stabilization scheme.  *Wickard*, 317 U.S. at 128.  Thus, in each case, the Court sustained Congress's power to regulate even individuals who claimed not to participate in interstate commerce, because these regulations were components of broad schemes regulating interstate commerce.

*Raich* came after the Court's decisions in *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), and thus highlights the central focus and limited scope of those decisions.  Unlike *Raich*, and unlike this case, neither *Lopez* nor *Morrison* involved regulation of economic activity.  And neither case addressed a measure that was integral to a comprehensive scheme to regulate activities in interstate commerce.  *Lopez* was a challenge to the Gun-Free School Zones Act of 1990, "a brief, single-subject statute making it a crime for an individual to possess a gun in a school zone."  *Raich*, 545 U.S. at 23.  Possessing a gun in a school zone is not an economic activity.  Nor was the prohibition against possessing a

gun "'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" Id. at 24 (quoting Lopez, 514 U.S. at 561). Likewise, the statute at issue in Morrison simply created a civil remedy for victims of gender-motivated violent crimes. Id. at 25. Gender-motivated violent crimes are not an economic activity either, and the statute at issue focused on violence against women, unlike the ACA, which focuses on broader regulation of economic activity in the health care services and health insurance markets.

### B.  The ACA Regulates the Interstate Markets in Health Insurance and Health Care Services.

Regulation of a $2.5 trillion interstate market that consumes more than 17% of the annual gross domestic product is well within the compass of congressional authority under the Commerce Clause. Pub. L. No. 111-148, §§ 1501(a)(2)(B), 10106(a). It has long been established that Congress has the power to regulate insurance, see United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 553 (1944), and health care services, see Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 743-44 (1976). Congress has repeatedly exercised its power over health insurance by, among other measures, providing directly for government-funded health insurance through the Medicare Act, and by adopting, over more than 35 years, numerous statutes regulating the content of policies offered by private insurers.[7]

---

[7]       In 1974, Congress enacted the Employee Retirement and Income Security Act, Pub L. No. 93-406, 88 Stat. 829 ("ERISA"), which establishes federal requirements for health insurance plans offered by private employers. A decade later, Congress passed the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, 100 Stat. 82 ("COBRA"), which allows workers and their families who lose their health benefits under certain circumstances the right to continue receiving certain benefits from their group health plans for a time. In 1996, Congress enacted the Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 ("HIPAA"), to improve access to health insurance by, among other things, generally prohibiting group plans from discriminating against individual participants and beneficiaries based on health status, requiring insurers to offer coverage to small businesses, and limiting the pre-existing condition exclusion period for group plans. 26 U.S.C. §§ 9801-03; 29 U.S.C.

Plaintiffs challenge to the minimum coverage provision fails.  That provision regulates decisions about how to pay for services in the interstate health care market.  These decisions are quintessentially economic, and they too fall within the traditional scope of the Commerce Clause.  As Congress recognized, "decisions about how and when health care is paid for, and when health insurance is purchased" are "economic and financial" and therefore "commercial and economic in nature."  Pub. L. No. 111-148, §§ 1501(a)(2)(A), 10106(a).[8]

### C.  The Minimum Coverage Provision Is an Integral Part of the Larger Regulatory Scheme and Is Necessary and Proper to Congress's Regulation of Interstate Commerce.

The ACA's reforms of the interstate insurance market – particularly its requirement that insurers guarantee coverage for all individuals, even those individuals with pre-existing medical conditions – could not function effectively without the minimum coverage provision.  The provision is an essential part of a larger regulation of interstate commerce, and thus, under Raich, is well within Congress's Commerce Clause authority.  Raich, 545 U.S. at 18.  Analyzing the minimum coverage provision under the Necessary and Proper Clause leads to the same conclusion for fundamentally the same reason.  See id. at 37 (Scalia, J. concurring).  The provision is a reasonable means to accomplish Congress's goal of ensuring access to affordable coverage for all Americans.

The Act adopts a series of measures to increase the availability and affordability of health insurance, including, in particular, measures to prohibit insurance industry practices that have denied coverage, terminated coverage, or increased premiums, for those with the greatest health

_____

§§ 1181(a), 1182; 42 U.S.C. §§ 300gg, 300gg-1.  HIPAA added similar requirements for individual insurance coverage to the Public Health Service Act.  Pub. L. No. 104-191, § 111, 110 Stat. 1979.  The ACA builds on these and other laws regulating health insurance.

[8]  Although Congress is not required to set forth particularized findings in support of an invocation of its commerce power, when, as here, it does so, courts "will consider congressional findings in [their] analysis."  Raich, 545 U.S. at 21.

care needs.  Effective for plan years beginning on or after September 23, 2010, the ACA

prohibits insurers from placing lifetime limits on the dollar value of coverage, rescinding

coverage except in cases of fraud, and imposing pre-existing exclusion conditions on children.

Pub. L. No. 111-148, §§ 10101(a), 10103(e).  Beginning in 2014, the Act will bar insurers from

refusing to cover individuals with pre-existing medical conditions and from setting eligibility

rules or premiums based on health status, medical condition, claims experience, or medical

history.  Pub. L. No. 111-148, § 1201.  These provisions, which directly regulate the content of

insurance policies sold nationwide, are clearly within the Commerce Clause power.  See, e.g.,

South-Eastern Underwriters, 322 U.S. at 553.

      The minimum coverage provision is an "essential" part of this larger regulatory scheme

for the interstate health care market.  Pub. L. No. 111-148, §§ 1501(a)(2)(H), 10106(a).

Congress found that, absent the minimum coverage provision, the insurance reforms would

encourage more individuals to forego or drop insurance, increasing insurance prices and

threatening the viability of the health care insurance market.  The new insurance regulations

would allow individuals to "wait to purchase health insurance until they needed care" – at which

point the ACA would obligate insurers to provide them with health insurance, subject to no

coverage limits or premium adjustments, despite the pre-existing conditions they may have.  Pub.

L. No. 111-148, §§ 1501(a)(2)(I), 10106(a).  Market timers, taking advantage of the absence of

exclusions for pre-existing conditions, would purchase insurance only when their health care

needs were substantial.  Premiums would increase because fewer people currently in good health

would participate in the insurance market.  In turn, many individuals with relatively less

substantial health care needs who remained in the market could well choose to become market

timers themselves, dropping their insurance until they needed to use it (i.e., after a significant

illness or accident occurs).  A "death spiral" of rising costs and premiums would result, creating

pressures that would "inexorably drive [the health insurance] market into extinction."  Health

Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm. on Ways

and Means, 111th Cong. 13 (2009) (hereinafter "Health Reform in the 21st Century") (statement

of Professor Uwe Reinhardt, Princeton University); see Alan C. Monheit et al., Community

Rating and Sustainable Individual Health Insurance Markets in New Jersey: Trends in New

Jersey's Individual Health Coverage Program Reveal Troubled Time for the Program, Health

Affairs, 167, 168 (July/Aug. 2004) (describing an "adverse-selection death spiral" in a market

with no exclusions, no individual premium adjustments, and no minimum coverage requirement)

(cited in statement of Dr. Reinhardt at 13 n.4).[9]  Absent the minimum coverage provision,

market forces would cause health insurance to become less affordable and available, in direct

contravention of Congress' purpose in enacting the ACA.  The provision is thus indispensable to

Congress' broader effort to regulate the underwriting practices that prevented many from

obtaining health insurance, Pub. L. No. 111-148, §§ 1501(a)(2)(H), (I), 10106(a).

    In other respects as well, the minimum coverage provision is essential to the Act's

comprehensive regulatory scheme to ensure that health insurance is available and affordable.

The provision works in tandem with the Act's reforms to reduce the upward pressure on

premiums caused by the practice of medical underwriting.  This process of individualized review

of an applicant's health status results in administrative fees that are responsible for 26 to 30

percent of the cost of premiums in the individual and small group markets.  Pub. L. No. 111-148,

---

[9]    See Health Reform in the 21st Century at 101-02 (testimony of Dr. Reinhardt); id. at 123-24 (submission of National Association of Health Underwriters) (observing, based on the experience of "states that already require guaranteed issue of individual policies, but do not require universal coverage," that "[w]ithout near universal participation, a guaranteed-issue requirement . . . would have the perverse effect of encouraging individuals to forego buying coverage until they are sick or require sudden and significant medical care").

§§ 1501(a)(2)(J), 10106(a).  And medical underwriting yields substantially higher risk-adjusted premiums or outright denial of insurance coverage for an estimated one-fifth of applicants. CBO, Key Issues, at 81.  The minimum coverage requirement helps to counteract these pressures by significantly increasing health insurance coverage and the size of purchasing pools, and thereby increasing economies of scale.  Pub. L. No. 111-148, §§ 1501(a)(2)(J), 10106(a).

Congress thus found that the minimum coverage provision is an integral part of the ACA's "comprehensive framework for regulating" health care services and health insurance markets, Raich, 545 U.S. at 24.  Congress had ample basis to conclude that not regulating this "class of activity" would "undercut the regulation of the interstate market" in health care and health insurance.  Raich, 545 U.S. at 18; see id. at 37 (Scalia, J., concurring in the judgment) ("Congress may regulate even noneconomic local activity if that regulation is a necessary part of a more general regulation of interstate commerce").

Because the minimum coverage provision is essential to Congress's overall regulatory reform of the interstate health care and health insurance markets, it is also a valid exercise of Congress's authority under the Necessary and Proper Clause, U.S. Const., art. I, § 8, cl. 18, to accomplish that goal.  "[T]he Necessary and Proper Clause grants Congress broad authority to enact federal legislation." United States v. Comstock, 130 S. Ct. 1949, 1956 (2010).  It has been settled since M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316 (1819), that this clause affords Congress the power to employ any means "reasonably adapted to the end permitted by the Constitution." Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 276 (1981) (internal quotation omitted).  And when Congress legislates in furtherance of a legitimate end, its choice of means is accorded broad deference.  See Sabri v. United States, 541 U.S. 600, 605 (2004); see also Comstock, 130 S. Ct. at 1956-57.  "[W]here Congress has the authority to enact

a regulation of interstate commerce, 'it possesses every power needed to make that regulation

effective.'" <u>Raich</u>, 545 U.S. at 36 (Scalia, J., concurring in the judgment) (quoting <u>United States</u>

<u>v. Wrightwood Dairy Co.</u>, 315 U.S. 110, 118-19 (1942)). As demonstrated above, Congress

reasonably found that the minimum coverage provision not only is adapted to, but is "essential"

to, achieving key reforms of the interstate health care and health insurance markets.

     <u>Virginia</u> does not aid plaintiffs.  The court did not decide whether Congress has the

power to enact the minimum coverage requirement.  Instead, the Court refused to dismiss the

Commonwealth's complaint, which challenged the minimum coverage provision, because of the

"presence of some authority arguably supporting the theory underlying each side's position."

<u>Virginia</u>, 2010 WL 2991385 at *16.  The Court simply decided that it wished to consider the

issue further.  <u>Id.</u>

### D.  The Minimum Coverage Provision Regulates Activity That Substantially Affects Interstate Commerce.

     The minimum coverage provision is a valid exercise of Congress's powers for a second

reason:  Decisions about whether to obtain health insurance or to attempt (often unsuccessfully)

to pay for health care out of pocket, in the aggregate substantially affect the interstate health care

market.  Individuals who forego health insurance coverage do not thereby forego health care.

This country guarantees emergency health care, regardless of insurance coverage or the ability to

pay, under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd.  CBO,

<u>Key Issues</u>, at 13.  In addition, most hospitals are nonprofit organizations that "have some

obligation to provide care for free or for a minimal charge to members of their community who

could not afford it otherwise."  <u>Id.</u>  For-profit hospitals "also provide such charity or reduced-

price care."  <u>Id.</u>  In other words, many of the uninsured will "receive treatments from traditional

providers for which they either do not pay or pay very little, which is known as 'uncompensated

care.'" CBO, <u>Key Issues</u>, at 13; <u>see also</u> Council of Economic Advisers ("CEA"), <u>The Economic Case for Health Care Reform</u> 8 (June 2009) (in <u>The Economic Case for Health Reform: Hearing Before the H. Comm. on the Budget</u>, 111th Cong. 5 (2009).

Uncompensated care, however, is not free. In the aggregate, that uncompensated cost amounted to $43 billion in 2008, about five percent of overall hospital revenues. CBO, <u>Key Issues</u>, at 114. Public funds subsidize these costs. Through programs such as Disproportionate Share Hospital payments, the federal government paid tens of billions of dollars for such uncompensated care in 2008 alone. H.R. Rep. No. 111-443, pt. II, at 983 (2010); <u>see also</u> CEA, <u>The Economic Case</u>, at 8. The remaining costs fall in the first instance on health care providers, which in turn "pass on the cost to private insurers, which pass on the cost to families." Pub. L. No. 111-148, §§ 1501(a)(2)(F), 10106(a). This cost-shifting effectively creates a "hidden tax" reflected in fees charged by providers (to the uninsured and the insured alike) and in premiums charged by insurers. CEA, <u>Economic Report of the President</u> 187 (Feb. 2010); <u>see also</u> H.R. Rep. No. 111-443, pt. II, at 985 (2010); S. Rep. No. 111-89, at 2 (2009). As premiums increase, more people decide not to buy coverage, further narrowing the risk pool and forcing upwards even more the price of coverage for the insured. The result is a self-reinforcing "premium spiral." <u>Health Reform in the 21st Century</u> at 118-19 (submission of American Academy of Actuaries); <u>see also</u> H.R. Rep. No. 111-443, pt. II, at 985 (2010). Small employers particularly suffer from this premium spiral, due to their relative lack of bargaining power. <u>See</u> H.R. Rep. No. 111-443, pt. II, at 986-88 (2010); Statement of Raymond Arth, Nat'l Small Business Ass'n at 5 (June 10, 2008) (submitted in <u>47 Million and Counting: Why the Health Care Market Is Broken: Hearing Before the S. Comm. on Finance</u>, 110th Cong. (2008)) (noting the need for

insurance reform and a minimum coverage provision to limit the growth of small business premiums).

The putative right to forego health insurance that plaintiffs champion includes decisions by some to engage in market timing like that discussed above.  These individuals will purchase insurance in later years, but choose in the short term to incur out-of-pocket costs with the backup of emergency room services that hospitals must provide whether or not the patient can pay.  See CBO, Key Issues at 12.  By making the economic calculation to opt out of the health insurance pool during these years, these individuals skew premiums upward for the insured population.  Yet, when they later need care, many of these uninsured will opt back into a system maintained in the interim by the insured.  In the aggregate, these economic decisions by the uninsured substantially affect the interstate health care market.  Congress may employ its Commerce Clause authority to address these substantial, aggregate effects.  See Raich, 545 U.S. at 16-17; Wickard, 317 U.S. at 127-28.

Plaintiffs cannot brush aside these marketplace realities by describing the decision to forego insurance coverage as "inactivity" and therefore beyond the reach of the Commerce Clause.  Compl. ¶¶ 20, 21.  That assertion misunderstands both the nature of the regulated activity and the scope of Congress's power.  Individuals who make the "economic and financial" choice to try to pay for health care services without insurance, Pub. L. No. 111-148, §§ 1501(a)(2)(A), 10106(a), are not passive bystanders divorced from the health care market.  They have chosen a method of payment for the services they will receive, no more passive than a decision to pay by credit card rather than by check.  Congress specifically focused on those who have such an economic choice, exempting certain individuals who cannot purchase health insurance for religious reasons, as well as those who cannot afford insurance, or those who

would suffer hardship if required to purchase it.  26 U.S.C. (I.R.C.) § 5000A(d), (e).  And

Congress found that this class of economic decisions, taken in the aggregate, results each year in

billions of dollars in uncompensated health care costs that are passed on to governments and

other third parties.  See, e.g., Pub. L. No. 111-148, §§ 1501(a)(2)(F), 10106(a).

     The ACA in fact regulates economic activity far more directly than provisions the

Supreme Court has previously sustained.  In Wickard, for example, the Court upheld a system of

production quotas, despite the plaintiff farmer's claim that the statute "forc[ed] some farmers

into the market to buy what they could provide for themselves."  317 U.S. at 129.  The Court

reasoned that "[h]ome-grown wheat . . . competes with wheat in commerce.  The stimulation of

commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions

thereon."  Id. at 128; see also id. at 127 ("The effect of the statute before us is to restrict the

amount which may be produced for market and the extent as well to which one may forestall

resort to the market by producing to meet his own needs.") (emphasis added).  See also Heart of

Atlanta Motel v. United States, 379 U.S. 241, 258-59 (1964) (Commerce Clause reaches

decisions not to engage in transactions with persons with whom plaintiff did not wish to deal);

Daniel v. Paul, 395 U.S. 298 (1969) (same); cf. United States v. Howell, 552 F.3d 709, 713-717

(8th Cir. 2009) (holding that Congress has the power, under the Commerce Clause and the

Necessary and Proper Clause, to enact sex offender registration requirement).  And in Raich, the

Court likewise rejected plaintiffs' claim that their home-grown marijuana was "entirely separated

from the market" and thus not subject to regulation under the Commerce Clause.  545 U.S. at 30.

Similarly, the ACA regulates the conduct of a class of individuals who almost certainly will

participate in the health care market, who have decided to finance that participation in one

particular way, and whose decisions impose substantial costs on other participants in that market.

Given the substantial effects of these economic decisions on interstate commerce, Congress has authority to regulate.

### E.   The Minimum Coverage Provisions Is a Valid Exercise of Congress's Independent Power under the General Welfare Clause.

Plaintiffs' challenge to the ACA also fails because, independent of its Commerce Clause authority, Congress also acted within its "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States[.]"  U.S. Const., art. I, § 8, cl. 1.  The power of Congress to use its taxing and spending power under the General Welfare Clause has long been recognized as "extensive." License Tax Cases, 72 U.S. (5 Wall.) 462, 471 (1867); see also Charles C. Steward Mach. Co. v. Davis, 301 U.S. 548, 581 (1937).  Congress may use its power under this Clause even for purposes that would exceed its powers under the other provisions of Article I.  See United States v. Sanchez, 340 U.S. 42, 44 (1950) ("Nor does a tax statute necessarily fall because it touches on activities which Congress might not otherwise regulate.").  To be sure, Congress must use this power under Article I, Section 8, Clause 1 to "provide for the . . . general Welfare."  But, as the Supreme Court held 75 years ago with regard to the Social Security Act, decisions of how best to provide for the general welfare are for the representative branches, not for the courts.  Helvering v. Davis, 301 U.S. 619, 640 (1937); id. at 645 & n.10.  See also South Dakota v. Dole, 483 U.S. 203, 207 (1987).

The minimum coverage provision falls within Congress's "extensive" General Welfare authority.  The Act requires individuals not otherwise exempt to obtain "minimum essential coverage" or to pay a penalty.  Id. § 1501(b), as amended by Pub. L. No. 111-152, § 1002 (adding I.R.C. § 5000A(a), (b)(1)).  Congress placed these provisions in a subtitle of the Internal Revenue Code labeled "Miscellaneous Excise Taxes."  Individuals who are not required to file

income tax returns for a given year are not subject to this provision.  I.R.C. § 5000A(e)(2).  In general, the penalty is calculated as the greater of a fixed amount or a percentage of the individual's household income, but cannot exceed the national average premium for the lowest-tier plans offered through health insurance exchanges for the taxpayer's family size.  I.R.C. § 5000A(c)(1), (2).  The individual must report the penalty on his tax return for the taxable year, as an addition to his income tax liability.  I.R.C. § 5000A(b)(2).  The penalty is assessed and collected in the same manner as other assessable penalties imposed under the Internal Revenue Code.[10]

That this provision has regulatory purposes does not place it beyond Congress's taxing power.[11]  Sanchez, 340 U.S. at 44 ("[A] tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed"); see also United States v. Kahriger, 345 U.S. 22, 27-28 (1953); cf. Bob Jones Univ., 416 U.S. at 741 n.12 (Court has "abandoned" older "distinctions between regulatory and revenue-raising taxes").[12]  So long as a statute is "productive of some revenue," the courts will not second-guess Congress's exercise of

_____

[10]    The Secretary of the Treasury may not collect the penalty by means of notices of federal liens or levies, or bring a criminal prosecution for a failure to pay the penalty.  I.R.C. § 5000A(g)(2).  The revenues derived from the minimum coverage penalty are paid into general revenues.

[11]    Congress has long used the taxing power as a regulatory tool, and in particular as a tool to regulate how health care is paid for in the national market. HIPAA, for example, limits the ability of group health plans to exclude or terminate applicants with pre-existing conditions, and imposes a tax on any such plan that fails to comply with these requirements. I.R.C. §§ 4980D, 9801-03. In addition, the Internal Revenue Code requires group health plans to offer COBRA continuing coverage to terminated employees, and similarly imposes a tax on any plan that fails to comply with this mandate. 26 U.S.C. § 4980B.

[12]    Nor does it matter that the statute labels the minimum coverage provision as a "penalty." There are many "penalties" in the tax code.  Moreover, "[in] passing on the constitutionality of a tax law [the Court is] concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it."  Nelson v. Sears, Roebuck & Co., 312 U.S. 359, 363 (1941) (internal quotation omitted).  See also Simmons v. United States, 308 F.2d 160, 166 n.21 (4th Cir. 1962) ("[I]t has been clearly established that the labels used do not determine the extent of the taxing power.").

its General Welfare Clause powers, and "will not undertake, by collateral inquiry as to the measure of the regulatory effect of a tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution." Sonzinsky v. United States, 300 U.S. 506, 514 (1937).

The minimum coverage provision easily meets this standard. The nonpartisan Joint Committee on Taxation included this provision in its review of the "Revenue Provisions" of the Act and the Reconciliation Act, analyzing it as a "tax," an "excise tax," and a "penalty." See Joint Comm. on Taxation, 111th Cong., Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as amended, in Combination with the "Patient Protection and Affordable Care Act" 31, 37 (Mar. 21, 2010); see also Joint Comm. on Taxation, Report JCX-47-09 (Nov. 5, 2009). Moreover, the Joint Committee, along with the CBO, repeatedly predicted how much revenue the provision would raise and considered that amount in determining the impact of the bill on the deficit. The CBO estimated that the minimum coverage provision would produce about $17 billion in revenue in the first five years of its operation. CBO Letter at tbl 4 at 2. Thus, as Congress recognized, this provision produces revenue alongside its regulatory purposes, which is all that Article I, Section 8, Clause 1 requires.

In any event, just as a court should interpret the "words of a statute . . . in their context and with a view to their place in the overall statutory scheme," FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (internal quotation omitted), so, too, the Court should analyze the purpose and function of the minimum coverage provision in context, as an integral part of the overall statutory scheme it advances. Congress reasonably concluded that the minimum coverage provision would increase the number of persons with insurance, permit the restrictions imposed on insurers to function efficiently, and lower insurance premiums. Pub. L.

No. 111-148, §§ 1501(a), 10106(a).  And Congress determined, also with substantial reason, that

this provision was essential to its comprehensive scheme of health insurance reform.  Congress

acted well within its prerogatives under the General Welfare Clause to include the minimum

coverage provision as an integrated component of the interrelated revenue and spending

provisions in the Act, and as a measure necessary and proper to the overall goal of advancing the

general welfare.  See, e.g., Buckley v. Valeo, 424 U.S. 1, 90 (1976) (grant of power under the

General Welfare Clause "is quite expansive, particularly in view of the enlargement of power by

the Necessary and Proper Clause").

### III.   The Minimum Coverage Provision Is Not a Direct Tax that Would Require Apportionment among the States.

Plaintiffs also challenge the minimum coverage provision as a "direct tax" that is not

apportioned among the States, allegedly in violation of Article I, Sections 2 and 9 of the

Constitution.  That argument is doubly incorrect.  Measures enacted in aid of Congress's

Commerce Clause powers are not subject to the apportionment requirement that can apply — but

very rarely does — when Congress relies exclusively on its taxing powers.  Moreover, if

analyzed as an exercise only of Congress's taxing authority, the minimum coverage provision is

not a "direct tax" — historically, an exceedingly narrow category.

#### A.  As a Valid Exercise of Congress's Commerce Clause Powers, the Minimum Coverage Provision Is Not Subject to Apportionment.

Article I, Section 8 grants Congress the "Power To lay and collect Taxes, Duties, Imposts

and Excises," but requires that "all Duties, Imposts and Excises shall be uniform throughout the

United States."  Article I, Section 2 provides that "direct Taxes shall be apportioned among the

several States which may be included within this Union, according to their respective Numbers."

Article I, Section 9 similarly provides that "[n]o Capitation, or other direct, Tax shall be laid,

27

unless in Proportion to the Census or Enumeration herein before directed to be taken."  U.S. Const. art. I, § 2, cl. 3 (amended by U.S. Const. amends. XIV, XVI); id., art. I, § 9, cl. 4 (amended by U.S. Const. amend. XVI).

These requirements apply only to statutes enacted exclusively in the exercise of Congress's taxing power, and not to statutory penalties in aid of other constitutional authorities — including the Commerce Clause.  In the Head Money Cases (Edye v. Robertson), 112 U.S. 580, 595-96 (1884), the Supreme Court considered whether a fee levied on non-citizen passengers brought into a U.S. port complied with the uniformity requirement of Article I, Section 8.  Although the fee appeared to satisfy the requirements of uniformity and "general welfare" applicable when Congress exercises its taxing power, the Court explained, such issues were beside the point because the fee was a "mere incident of the regulation of commerce."  Head Money Cases, 112 U.S. at 595.  The dispositive question was whether the fee was valid under the Commerce Clause, regardless of the limits of Congress's taxing authority.  Id. at 595.

In accord with the Head Money Cases, the courts of appeals have repeatedly emphasized that "direct tax" claims offer no cause to set aside a statutory penalty enacted in aid of Congress's regulatory powers under the Commerce Clause.  Thus, after the Supreme Court upheld the Agricultural Adjustment Act's quota provisions under the Commerce Clause in Wickard, 317 U.S. at 111, various plaintiffs argued that the penalties enforcing the quotas were "in reality a direct tax not levied in proportion to the census or enumeration as required under Article 1, Sections 2 and 9 and Clauses 3 and 4 of the Constitution."  Rodgers v. United States, 138 F.2d 992, 994 (6th Cir. 1943).  The court in Rodgers disagreed, because the penalty was "a method adopted by the Congress for the express purpose of regulating the production of cotton affecting interstate commerce" as well as "the fostering, protecting and conserving of interstate

commerce and the prevention of harm to the people from its flow."  The incidental effect of

raising revenue therefore did "not divest the regulation of its commerce character," and Article I,

Section 9 had "no application."  Id. at 995 (citing Head Money Cases, 112 U.S. at 595).[13]

Congress's Commerce Clause authority is not cabined by Congress's taxing power.  See, e.g.,

Bd. of Trustees v. United States, 289 U.S. 48, 58 (1933) ("[B]ecause the taxing power is a

distinct power and embraces the power to lay duties, it does not follow that duties may not be

imposed in the exercise of the power to regulate commerce.  The contrary is well established."

(citations omitted)).  Any attempt to conflate these authorities, and their respective limits, fails.

### B.  The Minimum Coverage Provision Is Not a "Direct Tax."

Even if the taxing power alone justifies the minimum coverage provision, the direct tax

clause still would not be implicated here.  From the beginning of the Republic, the Court has

treated only a very narrow category of taxes as subject to apportionment.  The minimum

coverage provision does not fall within that category.

The rule of apportionment was part of the compromise that counted slaves as three-fifths

of a person.  See Bruce Ackerman, Taxation and the Constitution, 99 Colum. L. Rev. 1, 8-13

(Jan. 1999).  Any effort, for example, to impose a tax on slaves would have fallen

disproportionately on non-slaveholding states because of the requirement that it be apportioned

by population, with the slave-holding states paying less per capita because of the three-fifths

rule.  As Justice Paterson explained in one of the Court's first landmark opinions, the "rule of

apportionment" was "the work of a compromise" that "cannot be supported by any solid

reasoning" and that "therefore, ought not to be extended by construction."  Hylton v. United

---

[13]     Other circuits agree.  United States v. Stangland, 242 F.2d 843, 848 (7th Cir. 1957);
Moon v. Freeman, 379 F.2d 382, 390-93 (9th Cir. 1967); see also South Carolina ex rel. Tindal
v. Block, 717 F.2d 874 (4th Cir. 1983); Goetz v. Glickman, 149 F.3d 1131 (10th Cir. 1998).

States, 3 U.S. (3 Dall.) 171, 178 (1796) (opinion of Paterson, J.)  Accordingly, courts have

construed capitation or other direct taxes narrowly to mean only head or poll taxes and taxes on

property.[14]

The Supreme Court briefly expanded the definition of a "direct tax" to include a tax on

personal property, as well as on income derived from real or personal property.  Pollock v.

Farmers' Land & Trust Co., 158 U.S. 601 (1895).  The Sixteenth Amendment, however,

repudiated the latter aspect of that holding.  See Brushaber v. Union Pac. R.R. Co., 240 U.S. 1,

19 (1916).  The continued validity of the first aspect of Pollock's holding — that taxes imposed

on the ownership of personal property are "direct" — is also in doubt.  See Ackerman, 99

Colum. L. Rev. at 51-52.  At most, Pollock stands for the proposition that a general tax on the

whole of an individual's personal property would be direct.  See Union Elec. Co. v. United

States, 363 F.3d 1292, 1300 (Fed. Cir. 2004).  In sum, whether or not any part of Pollock

survives, the Court has since made clear that only a tax imposed on property, "solely by reason

of its ownership," is a "direct tax."  Knowlton v. Moore, 178 U.S. 41, 81 (1900).

There is no sensible basis to claim that the minimum coverage provision imposes taxes

on property, real or personal.  It is not tied to the value of the individual's property.  It instead

imposes a tax on the choice of a method to finance the future costs of one's health care, a

decision made against the backdrop of a regulatory scheme that guarantees emergency care and

requires insurance companies to allow people to purchase insurance after they are already sick.

The penalty is imposed monthly, Pub. L. No. 111-148 § 1501(b) (adding I.R.C. § 5000A(c)(2)),

and each month is predicated on a new taxable event:  the individual's decision whether to obtain

qualifying health insurance coverage.  A tax predicated on a decision, as opposed to a tax on

---

[14]    See Springer v. United States, 102 U.S. 586, 602 (1881); Veazie Bank v. Fenno, 75
U.S. (8 Wall.) 533, 543 (1869); Hylton v. United States, 3 U.S. (3 Dall.) 171 (1796).

property, has always been understood to be indirect.  United States v. Mfrs. Nat'l Bank of

Detroit, 363 U.S. 194, 197-98 (1960); Tyler v. United States, 281 U.S. 497, 502 (1930).  Under

any plausible interpretation, the penalty is not a direct tax.

Nor is the requirement a "capitation tax."  Justice Chase explained that a capitation (or

poll, or head) tax is one imposed "simply, without regard to property, profession, or any other

circumstance."  Hylton, 3 U.S. at 175 (opinion of Chase, J.); see also Pac. Ins. Co. v. Soule, 74

U.S. 443, 444 (1868) (adopting Justice Chase's definition).  The minimum coverage provision is

not a flat tax imposed without regard to the taxpayer's circumstances.  To the contrary, among

other exemptions, the Act excuses persons with incomes below the threshold for filing a return,

as well as persons for whom the cost of coverage would exceed 8 percent of household income.

I.R.C. § 5000A(e)(1), (2).[15]  The payment required by the Act further varies with the taxpayer's

income, subject to a floor of a particular dollar amount, and to a cap equal to the cost of

qualifying coverage.  I.R.C. § 5000A(c)(1), (2).  And, of course, the penalty does not apply at all

if individuals obtain coverage.  I.R.C. § 5000A(a), (b)(1).  The minimum coverage provision thus

is tailored to the individual's circumstances and is not a capitation tax.

IV.     **Plaintiffs' Tenth Amendment Claim Should Be Dismissed.**

In Count I, plaintiffs assert that the minimum coverage provision violates the Tenth

Amendment.  Compl. ¶ 32.  There are two kinds of Tenth Amendment challenges.  In one kind, a

plaintiff invokes the Tenth Amendment in contending that the federal government has

impermissibly commandeered a state government and thereby impinged on the state's

---

[15]     Thus, even if the minimum coverage provision would have been viewed as a direct tax
prior to the Sixteenth Amendment, given that Congress designed the minimum coverage
provision penalty to vary in proportion to the individual's income, I.R.C. § 5000A(c)(1)(B),
(c)(2), it would fall within Congress's authority to "to lay and collect taxes on incomes, from
whatever source derived, without apportionment among the several States, and without regard to
any census or enumeration," U.S. Const. amend. XVI.

sovereignty.  New York v. United States, 505 U.S. 144, 161 (1992).  In the other kind, a plaintiff

relies on the Tenth Amendment in alleging that a statute is not "authorized by one of the powers

delegated to Congress in Article I of the Constitution."  Id. at 155.

The Complaint does not specify what kind of Tenth Amendment challenge plaintiffs are

asserting, but either way, the claim fails.  The Eighth Circuit has recently held that private

citizens do not have third-party standing to raise a commandeering claim on behalf of a state.

"We now join the majority of circuits and hold that a private party does not have standing to

assert that the federal government is encroaching on state sovereignty in violation of the Tenth

Amendment absent the involvement of a state or its instrumentalities."  United States v. Hacker,

565 F.3d 522, 526 (8th Cir. 2009).  Plaintiffs are private parties, and the State of Arkansas is not

involved in this case.  Plaintiffs therefore lack standing to raise a commandeering claim.

If plaintiffs mean, through their Tenth Amendment claim, to restate their allegations that

Congress lacks power under Article I to enact the ACA, their claim still fails.  First, plaintiffs

have no standing to raise the claim, for the same reasons that plaintiffs have no standing to raise

their Article I claims.  See § I.A. above.  Moreover, "[i]f a power is delegated to Congress in the

Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the

States."  New York, 505 U.S. at 156.  The Commerce Clause and the General Welfare Clause

provide ample constitutional support for Congress' enactment of the ACA.  See § II above.

Hence, there is no Tenth Amendment bar to the ACA.  This claim should be dismissed.

## V.     The Guarantee Clause Claim Fails.

Plaintiffs allege that the ACA violates the Constitution's Guarantee Clause, which

instructs the United States to "guarantee to every state in this Union a Republican Form of

Government," U.S. Const., art. IV, § 4.  Specifically, plaintiffs contend that the ACA has

deprived plaintiffs, as citizens of Arkansas, of "their right to be [ ] member[s] of a republican

form of [state] government."  Compl. ¶ 31.

This claim fails on three incontestable grounds (independent of plaintiffs' general lack of

standing, see § I.A. above).  First, the Supreme Court has held that Guarantee Clause claims are

nonjusticiable under the political questions doctrine:  "Guaranty Clause claims involve those

elements which define a 'political question,' and for that reason and no other, they are

nonjusticiable."  Baker v. Carr, 369 U.S. 186, 218 (1962).[16]  See also City of Rome v. United

States, 446 U.S. 156, 182 n. 17 (1980) superseded by statute on other grounds, Voting Rights Act

Amendments of 1982, 96 Stat. 131, codified at 42 U.S.C. § 1973b(a)(1); Luther v. Borden, 7

How. 1, 12 L.Ed 581 (1849).

Second, individuals do not have prudential standing to raise Guarantee Clause claims.

The Guarantee Clause confers rights on states, not private citizens. U.S. Const., art. IV, § 4

(providing a "guarantee" of a republican form of government to "every state").  In the analogous

context of the Tenth Amendment, the Eighth Circuit has held that private citizens do not have

standing to bring Tenth Amendment claims that assert the sovereign rights of states.  Hacker,

565 F.3d at 525-27.  The Court concluded in Hacker that a plaintiff "generally must assert his

own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of

third parties."  Id. (quotation and citation omitted).  That holding applies with equal force here.

Third, the ACA has not deprived Arkansas of a republican form of government.  Courts

have held that if Guarantee Clause claims are justiciable, the Clause could "only [be] offended in

---

[16]     The Supreme Court in New York v. United States, 505 U.S. 144, 185 (1992), assumed,
without deciding, that Guarantee Clause claims are justiciable.  But it did not overturn the long-
line of cases holding to the contrary.  Id. at 184 (collecting cases).  Accordingly, courts have
continued to dismiss Guarantee Clause claims as raising non-justiciable political questions.  See,
e.g., State of California v. United States, 104 F.3d 1086, 1091 (9th Cir. 1997).

highly limited circumstances," such those involving the "aboli[tion] [of] the legislature" or the "the establishment of a monarchy by a state."  See, e.g., Largess v. Supreme Judicial Court for Mass., 373 F.3d 219, 229 (1st Cir. 2004).  The ACA reforms the health care insurance and health services market.  It does not abolish the Arkansas Legislature. It does not establish a monarchy. Indeed, it does not alter the form of the Arkansas state government in any way.  The State remains free to set its "legislative agenda" and "state government officials remain accountable to the local electorate." New York, 505 U.S. at 185.  The claim fails.[17]

## CONCLUSION

For the above stated reasons, the Court should dismiss plaintiffs' complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Dated:  August 3, 2010                              Respectfully submitted,

                                                    TONY WEST
                                                    Assistant Attorney General

                                                    JANE DUKE
                                                    United States Attorney

                                                    SHEILA M. LIEBER
                                                    Deputy Director, Federal Programs
                                                    Branch, Civil Division

                                                       /s/ Justin M. Sandberg____
                                                    JUSTIN M. SANDBERG
                                                    (Ill. Bar No. 6278377)

---

[17]     As the fourth count of their complaint, plaintiffs raise a "Declaratory Judgment" claim under 28 U.S.C. § 2201. Compl. ¶¶ 42-44.  But "[i]t is clear that the statute allowing federal courts to make declaratory judgments, 28 U.S.C. § 2201(a), does not create a cause of action itself but merely creates a remedy when a plaintiff has already stated a cause of action for which the federal court has jurisdiction."  Bd of Trustees of Cedar Rapids Pediatric Clinic, P.A., Pension Plan v. Cont'l Assurance Co., 690 F. Supp 792, 795 n.4 (W.D. Ark. 1988) (Arnold, Morris S., J.); see also Buck v. American Airlines, Inc., 476 F.3d 29, 33 n.3 (1st Cir. 2007) ("Although the plaintiffs style "declaratory judgment" as a cause of action, the provision that they cite, 28 U.S.C. § 2201(a), creates a remedy, not a cause of action.").  Since § 2201 does not create a cause of action, the Court should dismiss Count Four.

Trial Attorney
U.S. Dept. of Justice, Civil Division,
Federal Programs Branch
20 Mass. Ave., NW, Rm. 7302
Washington, DC 20001
(202) 514-5838 phone
(202) 616-8202 fax
justin.sandberg@usdoj.gov

<u>Attorneys for Defendants</u>

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| _____ ) | | |
| JEANNE BURLSWORTH, et al., ) | | |
| ) | | |
| Plaintiffs, ) | | |
| ) | | |
| v. ) | Case No. 4:10-CV-258 (SWW) | |
| ) | | |
| ERIC HOLDER, in his official capacity ) | | |
| as Attorney General of the United States, ) | | |
| et al., ) | | |
| ) | | |
| Defendants. ) | | |
| _____) | | |

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2010, I electronically filed the foregoing Memorandum in Support of Motion to Dismiss with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

> Chris H. Stewart
> Stewart Law Firm
> Post Office Box 3422
> Little Rock, AR 72201
> 501-687-1397
> Email: arklaw@sbcglobal.net

>                            __/s/ Justin M. Sandberg____
>                            JUSTIN M. SANDBERG
>                            (Ill. Bar No. 6278377)
>                            Trial Attorney
>                            U.S. Dept. of Justice, Civil Division,
>                            Federal Programs Branch
>                            20 Mass. Ave., NW, Rm. 7302
>                            Washington, DC 20001
>                            (202) 514-5838 phone
>                            justin.sandberg@usdoj.gov
>
>                            Attorney for Defendants

36